ACCEPTED
02-15-107-CR
SECOND COURT OF APPEALS
FORT WORTH, TEXAS
11/19/2015 11:56:53 AM
DEBRA SPISAK
CLERK

# IN THE COURT OF APPEALS

## SECOND JUDICIAL DISTRICT OF TEXAS

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
11/19/2015 11:56:53 AM
DEBRA SPISAK
Clerk

## AT FORT WORTH

| | | |
|---|---|---|
| JOHN ST. ANGELO, **Appellant** | § § § | |
| VS. | § § | NO. 02-15-00107-CR |
| THE STATE OF TEXAS, **Appellee** | § § § § | |

# APPELLANT'S BRIEF SPECIFYING ERROR OF WHICH APPELLANT COMPLAINS ON APPEAL

## APPEALED FROM CAUSE NO. 1354157D IN THE 396th JUDICIAL DISTRICT COURT OF TARRANT COUNTY, TEXAS

**ORAL ARGUMENT IS REQUESTED**

Robert K. Gill
**ATTORNEY FOR APPELLANT**
201 Main Street, STE. 801
FORT WORTH, TEXAS 76102
(817) 803-6918
(817) 338-0700 FAX
STATE OF TEXAS BAR CARD
NUMBER 07921600
*BOB@GILLBRISSETTE.COM*

# THE PARTIES INVOLVED

MR. JOHN ST. ANGELO                          APPELLANT
    TDCJ 1990345
    Clements Unit
    9601 Spur 591
    Amarillo, TX 79107

HONORABLE ROBERT K. GILL                      ATTORNEY FOR APPELLANT
    201 Main Street, Ste. 801                        (APPEAL)
    Fort Worth, TX 76102

HONORABLE KATHY LOWTHORP                       ATTORNEY FOR APPELLANT
    410 W. Main Street                               (TRIAL)
    Arlington, TX 76010

HONORABLE AL LAZARUS                          ATTORNEY FOR APPELLANT
    115 W. 2nd Street, Ste. 202                      (TRIAL)
    Fort Worth, TX 76102

HON. SHAREN WILSON                            DISTRICT ATTORNEY
    401 W. Belknap St.                               TARRANT COUNTY, TX
    Fort Worth, TX 76196

HONORABLE ALLENNA BANGS                       ASST. DISTRICT ATTORNEY
    401 W. Belknap St.                               TARRANT COUNTY, TEXAS
    Fort Worth, TX 76196

HONORABLE JAMES HUDSON                        ASST. DISTRICT ATTORNEY
    401 W. Belknap St.                               TARRANT COUNTY, TEXAS
    Fort Worth, TX 76196

HONORABLE GEORGE GALLAGHER                     JUDGE PRESIDING
    401 W. Belknap St.                               396TH DISTRICT COURT OF
    Fort Worth, TX 76196                             TARRANT COUNTY, TEXAS

# TABLE OF CONTENTS

The Parties Involved ..................................................................................................... i

Table of Contents ........................................................................................................ ii

List of Authorities ...................................................................................................... iii

Statement of the Case ................................................................................................. 1

Issues Presented........................................................................................................... 2

Statement of Facts ...................................................................................................... 2

Arguments and Authorities:

    Point of Error One:
        *Error in admitting custodial, oral statements* ...................................... 6

    Point of Error Two:
        *Restricting Defense's Voir Dire* ......................................................... 14

    Point of Error Three:
        *Email not sufficiently authenticated* .................................................. 17

Prayer........................................................................................................................ 21

Certificate of Service................................................................................................. 22

Certificate of Compliance ......................................................................................... 22

Appendix .................................................................................................................. 23

# LIST OF AUTHORITIES

**United States Supreme Court Cases**      <u>Page</u>

*Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 1876, 68 L.Ed.2d 359 (1981).......13

*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966) .13

*United States v. Siddiqui*, 235 F.3d 1318, 1322-23 (11th Cir. 2000) ......................19

**Texas Court of Criminal Appeals Cases**      <u>Page</u>

*Caldwell v. State*, 818 S.W.2d 790 (Tex. Crim. App. 1991) ......................................15

*Clemments v. State*, 940 S.W.2d 207 (Tex. App.—San Antonio 1997, pet. ref'd) ...................................................................................................................15, 16, 17

*Coleman v. State*, 833 S.W.2d 286 (Tex. App.—Houston [14th Dist.] 1992, no pet.) ............................................................................................................................20

*De La Rosa v. State*, 414 S.W.2d 668 (Tex. Crim. App. 1967) ...............................15

*Druery v. State*, 225 S.W.3d 491 (Tex. Crim. App. 2007) .......................................18

*Elizondo v. State*, 382 S.W.3d 389 (Tex. Crim. App. 2012) ...............................6, 7, 9

*Guerra v. State*, 771 S.W.2d 453 (Tex. Crim. App. 1988) ......................................16

*Hailey v. State*, 413 S.W.3d 457 (Tex. App.—Fort Worth 2012, pet. ref'd) ......8, 10

*Harris v. State*, 784 S.W.2d 5, 23 (Tex. Crim. App. 1989) .....................................16

*Herrera v. State*, 241 S.W.3d 520 (Tex. Crim. App. 2007) .......................................6

*Jones v. State*, 223 S.W.3d 379 (Tex. Crim. App. 2007) ....................................15, 16

*Kephart v. State*, 875 S.W.2d 319 (Tex. Crim. App. 1994) .................................18

*Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997) .............................15

*London v. State*, 325 S.W.3d 197 (Tex. App.—Dallas 2008, pet. ref'd) ................16

*Massimo v. State*, 144 S.W.3d 210 (Tex. App.—Fort Worth 2004, no pet.) ..........19

*Mbugua v. State*, 312 S.W.3d 657 (Tex. App. – Houston [1st Dist.] 2009, pet. ref'd) ..................................................................................................................10

*McCarter v. State*, 837 S.W.2d 117 (Tex. Crim. App. 1992) .........................15, 17

*Morris v. State*, 1 S.W.3d 336 (Tex. App.—Austin 1999, no pet.) ...................15, 16

*Oriji v. State*, 150 S.W.3d 833 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) 9

*Ratliff v. State*, 690 S.W.2d 597 (Tex. Crim. App. 1985) .................................15

*Rodriguez-Flores v. State*, 351 S.W.3d 612 (Tex. App.—Austin 2011, pet. ref'd) 13

*Shea v. State*, 167 S.W.3d 98 (Tex. App.—Waco 2005, pet. ref'd) .........................20

*Smith v. State*, 703 S.W.2d 641 (Tex. Crim. App. 1985) .................................15

*Staley v. State*, 887 S.W.2d 885 (Tex. Crim. App. 1994) .................................16

*Taylor v. State*, 268 S.W.3d 571 (Tex. Crim. App. 2008) .................................11

*Tienda v. State*, 358 S.W.3d 633 (Tex. Crim. App. 2012) .............................18, 20

*Tobar v. State*, 850 S.W.2d 182 (Tex. Crim. App. 1993) .................................15

*Varkonyi v. State*, 276 S.W.3d 27 (Tex. App.—El Paso 2008, pet. ref'd) .............20

*Whitemon v. State*, 460 S.W.3d 170 (Tex. App.—Fort Worth 2015, pet. ref'd) ....16

*Wilkerson v. State*, 173 S.W.3d 521, 529 (Tex. Crim. App. 2005) ........7, 8, 9, 10, 13

*Wood v. State*, 18 S.W.3d 642, 647 (Tex. Crim. App. 2000) ...............................18, 20

Constitutions, Rules, Statutes

Tex. Code Crim. Pro. Art. 38.22 ........................................................................6, 7

Tex. R. Evid. 803(4) .............................................................................................10

# IN THE COURT OF APPEALS

# SECOND JUDICIAL DISTRICT OF TEXAS

# AT FORT WORTH

| | | |
|---|---|---|
| JOHN ST. ANGELO | § | |
| Appellant | § | |
| | § | |
| VS. | § | NO. 02-15-00107-CR |
| | § | |
| STATE OF TEXAS, | § | |
| Appellee | § | |

TO THE HONORABLE COURT OF APPEALS:

COMES NOW, JOHN ST. ANGELO, hereinafter referred to as Appellant, and respectfully submits this his brief specifying errors of which Appellant complains on appeal. Pursuant to the Texas Rules of Appellate Procedure, Appellant would show through his attorney the following points of error of which he wishes to complain.

## STATEMENT OF THE CASE

Appellant was charged by indictment with the offense of murder. [R. R. 5:14-5.] [C. R. 6.] Appellant plead not guilty and testified that he acted in self-defense. The jury rejected his defense and Appellant was convicted of murder.

The jury ultimately recommended that Appellant be sentenced to confinement for life in the Texas Department of Criminal Justice Institutional Division and fined $10,000. [R. R. 10:142.] [C. R. 153.] The trial court certified that Appellant had the right to appeal. [C. R. 159.] Appellant timely filed notice of appeal on March 27, 2015. [C. R. 160.]

## ISSUES PRESENTED

### Point of Error One

The trial court erred by admitting custodial statements of Appellant made in response to interrogation by a MedStar paramedic who was acting as an agent of law enforcement in violation of *Tex. Code Crim. Pro.* Art. 38.22.

### Point of Error Two

The trial court abused its discretion by unreasonably restricting defense counsel's voir dire.

### Point of Error Three

The trial court abused its discretion by admitting an email that was not sufficiently authenticated.

## STATEMENT OF FACTS

Appellant and complainant Suzanne Parsons had known each other since childhood. [RR 7:205.] After leading separate lives, including marriages to

others, they became a couple in approximately 2007. [RR 7:128.] Appellant and Suzanne were eventually married. [RR 7:218.] After a time, the marriage turned bad. [RR 7:130.] Appellant and Suzanne were divorced in December of 2013. [RR 7:135.] However, they continued to see each other socially and for work purposes. [RR 5:43, 44-5.]

During his working life, Appellant had been successful in the construction business. [RR 7:166-7.] However, in recent times Appellant had experienced a serious downturn in his business and personal fortunes. [RR 5:144.] At the time of this alleged offense, Appellant was working as a handy man for the RE/MAX real estate company in North Fort Worth on Heritage Trace. [RR 5:44-5.] The complainant Suzanne Parsons, worked as a real estate agent and property manager out of the same RE/MAX office. [RR 5:31-2.]

In late December of 2013, Appellant made a driving trip back east to Maryland to pick up his son and daughter who were going to stay with him in Texas for a period of time. [RR 7:248.] When he returned to Texas, Appellant returned to work at the RE/MAX real estate office where he and the complainant both worked. [RR 7:246.]

On December 30, 2013, Appellant traveled to the RE/MAX office to do some remodeling work on a closet inside the building. [RR 5:51, 53.] The

complainant was also at work that day. [RR 5:45.] During the course of the day Appellant was seen in the complainant's office and the atmosphere was tense. [RR 5:51-2.] At some point the tension turned to violence with the complainant ending up stabbed to death with a knife. [RR 5:97.] Appellant left the building through a rear office window and drove off. [RR 5:169.] While emergency personnel and police were tending to the scene at the RE/MAX office, Appellant was driving around the Metroplex in a fog. [RR 7:281-2.]

The next day Appellant was located by the Fort Worth Police Department at a residence in North Fort Worth on Permian Lane. [RR 6:50.] The house was surrounded by the Fort Worth Police Department SWAT team; including snipers and hostage negotiators. [RR 6:50-3.] Eventually Appellant was taken into custody. [RR 6:63-5.] Appellant was transported to JPS Hospital with serious injuries sustained during the stand off with police. [RR 6:258.] While he was in an ambulance Appellant was questioned about the offense by a MedStar paramedic. [RR 6:258-63.]

Due to his injuries, Appellant was hospitalized at JPS for a period of days. [RR 66:28-9.] While hospitalized, Appellant requested and was appointed counsel to represent him in the instant case. [CR:14.]

Appellant was subsequently indicted and prosecuted for the offense of murder of Suzanne Parsons. [RR 5:14.]

At trial, Appellant testified and described to the jury how he was required to defend himself against the complainant's use of deadly force. [RR 7:275-9.] The jury was charged that if they believed that Appellant acted reasonably in his defense, that he should be acquitted of murder. [CR: 134-7.] The jury rejected Appellant's self-defense claim and convicted him of murder. [RR 8:47.]

After hearing further evidence at the punishment phase of the trial, the jury rejected Appellant's claim that he was acting under the immediate influence of sudden passion arising from an adequate cause at the time he committed the offense. They jury then recommended that Appellant be sentenced to confinement in the Institutional Division for life, along with a fine of $10,000. [RR 10:142.]

POINT OF ERROR ONE

I. Point of Error

The trial court erred by admitting custodial statements of Appellant made in response to interrogation by a MedStar paramedic who was acting as an agent of law enforcement in violation of *Tex. Code Crim. Pro.* Art. 38.22.

II.    Background Facts

The trial court allowed the State of Texas to present certain oral statements of Appellant made while in the custody of the Fort Worth Police Department and pursuant to questioning by a MedStar ambulance paramedic named James Evans. The statements were presented to the jury through the testimony of Officer Brandy Salazar of the Fort Worth Police Department who was present and recorded Appellant's statements when they were made. [RR 6:255.] It is clear from the record that paramedic Evans was acting as an agent of law enforcement when he interrogated Appellant. As such, the statements of Appellant were illegally admitted because the State did not comply with *Tex. Code Crim. Pro.* Art. 38.22. *Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007).

III.    Standard of Review

The trial court held a motion to suppress hearing on the issue of the admissibility of Appellant's unwarned, unrecorded custodial statements. Appellate courts review a trial court's ruling on a motion to suppress under an abuse of discretion standard. *Elizondo v. State*, 382 S.W.3d 389, 393-94 (Tex. Crim. App. 2012). When the trial court's findings of fact are based on an evaluation of credibility and demeanor, appellate courts afford almost total deference to the trial court's determination of facts that are supported by the

record. *Elizondo*, 382 S.W.3d 393-94. Appellate courts review *de novo* the trial court's application of the law to the facts and uphold the trial court's ruling if it is supported by the record and is correct under any theory of law applicable to the case. *Elizondo*, 382 S.W.3d 393-94. As will be seen, the trial court misapplied the law to the facts of this case.

IV.   Applicable Law

Under *Tex. Code Crim. Pro.* Art. 38.22 sec. 3, no oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless certain conditions exist. These conditions include the administration of the rights under art. 38.22 sec. 2(a), and that an electronic recording be made of the statement. In this case, neither of those conditions were satisfied because Appellant was not administered his warnings as required for admissibility under art. 38.22 sec 2(a) and because no electronic recording was made of Appellant's oral custodial statements as required under art. 38.22 sec. 3.

It is axiomatic that Art. 38.22 applies to custodial interrogation by law enforcement officers. Art. 38.22 applies also where a particular person is working as an agent for or on behalf of the police by interrogating a person in custody. *Wilkerson v. State,* 173 S.W.3d 521, 529-30 (Tex. Crim. App. 2005).

The law does not presume an agency relationship, and the party alleging such a relationship has the burden of proving that it exists. *Wilkerson*, 173 S.W.3d at 529; *Elizondo*, 382 S.W.3d at 395.

To determine if an agency relationship exists, the courts must examine the entire record and consider three factors: (1) the relationship between the police and the potential police agent, (2) the interviewer's actions and perceptions, and (3) the defendant's perceptions of the encounter. *Wilkerson*, 173 S.W.3d at 530–31. This test helps courts determine whether the interviewer was acting as an instrumentality or was "in cahoots" with the police or prosecution. *Elizondo*, 382 S.W.3d at 394.

V.    Application of Law to Facts

It is apparent from the record that Appellant was in custody at the time he was interrogated by MedStar paramedic James Evans who was acting as an agent of law enforcement. [RR 6:257.]

The relationship between law enforcement and Evans in this case demonstrates that Evans was acting as an agent of the Fort Worth Police Department while he interrogated Appellant. The *Wilkerson* court directed courts to ask certain questions to determine whether law enforcement was attempting to use an interviewer as its anointed agent:

• Did the police know the interviewer was going to speak with the defendant?

• Did the police arrange the meeting?

• Were the police present during the interview?

• Did they provide the interviewer with the questions to ask?

• Did they give the interviewer implicit or explicit instructions to get certain information from the defendant?

• Was there a "calculated practice" between the police and the interviewer that was likely to evoke an incriminating response from the defendant during the interview?

• Does the record show that the police were using the agent's interview to accomplish what they could not lawfully accomplish themselves?

*Wilkerson*, 173 S.W.3d at 530; *Hailey v. State*, 413 S.W.3d 457, 482 (Tex. App.— Fort Worth 2012, pet. ref'd).

The relationship between the Fort Worth Police Department and MedStar is a close one. MedStar is in fact, part of the SWAT team that assembles at critical incidents, such as the one described in this case. [RR 3:8.] MedStar was called in to assist the Fort Worth Police Department SWAT team the afternoon of Appellant's arrest. [RR 3:8.] MedStar was staged near the scene for at least two hours. [RR 3:9.] The police department directed the movements of the MedStar ambulance on the occasion in question. [RR 3:9.] While MedStar was treating

Appellant, a police officer asked a question of paramedic Evans that prompted Evans to inspect Appellant's airway. [RR 3:12]

### 1. The Police Knew Evans Was Going To Interview Appellant

Turning to the factors outlined above, the police would have known that Evans was going to speak with Appellant. MedStar routinely allows a police officer to accompany them in their ambulance unit when transporting a prisoner to a medical facility; and Officer Brandy Salazar did so on this occasion. [RR 6:257-8.]

### 2. The Police Arranged The Meeting

The police obviously arranged the meeting between Appellant and Evans by placing Appellant in their custody and then in Evans' ambulance. [RR 6:257-8.] Officer Salazar's name is embedded in the ambulance report completed by Evans, which was admitted during the motion to suppress hearing as Defendant's Exhibit 2. [RR 3:24] Evans was aware of the allegations against Appellant at the time he was transporting Appellant. [RR 3:16]

### 3. A Police Officer Was Present During The Interview

It is important to note that MedStar paramedic Evans interrogated Appellant in the presence of a Fort Worth police officer. [RR 6:259.] This fact in and of itself distinguishes the instant case from reported cases examining this issue. In

other cases holding that there is no agency relationship between a civilian questioner and law enforcement, a law enforcement agent was not present when the questioning took place. *See Elizondo*, 382 S.W.3d at 391 (where a retail store employee had the defendant sign a civil demand notice); *Oriji v. State*, 150 S.W.3d 833, 835 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd)(where a statement was taken from the defendant by a retail store employee). In this case, Evans and Officer Salazar were clearly acting in tandem to elicit incriminating information from Appellant.

### 4. Evans' Questions Were Law Enforcement Questions

As can be seen from the record as a whole, Evans asked questions that went to the heart of the police department's investigation. He asked Appellant pithy questions about both the murder of Ms. Parsons and the standoff with the SWAT team. [RR: 6:262.]

### 5. There Was A Calculated Practice

Adding up the factors discussed above leads to the conclusion that the questions asked by Evans were calculated to gather certain information from Appellant. The information gathered was obviously important because it was offered and relied on by the State during trial. It was information that could have been gathered from no source other than Appellant.

The totality of the circumstances here adds up to a conclusion that there was a calculated practice between the police and Evans.

6. Evans Accomplished What The Police Could Not

The circumstances illustrate that the police used Evans to accomplish what they could not accomplish themselves; that is to gain information that only Appellant could provide through a procedure that skirted his Fifth Amendment and art. 38.22 rights.

Moreover, Evans' actions and perceptions, as well as those of Officer Salazar, are an important factor in this analysis; and demonstrate that Evans was acting as an agent of law enforcement.

Under *Wilkerson,* the courts look to whether the interviewer believed he was acting as an agent of law enforcement by asking:

• What was the interviewer's primary reason for questioning the person?

• Were the questions aimed at gaining information and evidence for a criminal prosecution, or were they related to some other goal?

• How did the interviewer become involved in the case?

• Did the interviewer help "build a case" that led to the person's arrest, or was the interviewer pursuing some other goal or performing some other duty?

• At whose request did the interviewer question the arrestee?

*Wilkerson*, 173 S.W.3d at 530; *Hailey*, 413 S.W.3d 457, 482 (Tex. App.—Fort Worth 2012, pet. ref'd).

### 1. Primary Reason Was To Elicit Incriminating Information

Evans primary reason for questioning Appellant was to elicit incriminating information. The record shows that MedStar was not able to actually treat Appellant for his injuries. Evans was asked during testimony if he administered treatment of any kind. His response was "the only real treatment we can do for something like that is just comfort, trying to relieve pressure, possibly padding or rolling them a little bit to their side." [RR 3:15.] There was testimony that Appellant was not in a life-threatening condition. [RR 3:14.] Thus, any questions asked of Appellant by Evans were superfluous and irrelevant for medical purposes at the time they were posed.

### 2. Questions Aimed At Gaining Information For Prosecution

The only reason Evans asked these questions was to aid the Fort Worth Police Department in their investigation of Appellant. Any assertions to the contrary are not credible. It should also be noted that the drive time from the scene to the hospital where Appellant was taken was only ten minutes. [RR 6:258.] This factor reduces the need for a paramedic to ask detailed medical

questions because Appellant was not under their control for a significant amount of time.

The record demonstrates that Evans asked questions that went far beyond what might be expected of someone seeking to render medical assistance.[1] Evans' questions were not pertinent to treatment and clearly were aimed at gaining information for a criminal prosecution. For example, Officer Salazar of the Fort Worth Police Department testified that Evans asked the questions, "Were you shooting at the officers?" and "What happened yesterday, did you do something bad?" [RR 6:262.] Salazar testified to the jury that Appellant answered both of these questions "yes." Salazar further testified that Appellant was asked, "Did you hurt her?" to which he answered, "Yes, we were fighting. I was sick of her mouth," and "Did you know you were going to do that?" to which Appellant purportedly answered, "Something about Mexico and she kept running her mouth." [RR 6:262.] At the pretrial hearing, Evans, tried to justify this line of

---

[1] To illustrate how far from medical questioning paramedic Evans went, this court can consider the law surrounding the admissibility of hearsay statements admitted under the "statement made for medical diagnosis or treatment" exception of *Tex. R. Evid.* 803(4). Under this exception to the hearsay rule, not all answers to questions posed by the doctor or nurse to a patient qualify for admission. Statements that are not deemed "pertinent to treatment" are not admissible. *See Mbugua v. State*, 312 S.W.3d 657, 671 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd)(where the court found that it was not pertinent to treatment to know how the declarant's injuries were inflicted). "Pertinent to treatment" means those statements that are reasonable for the health care provider to rely on in treating the declarant. *Taylor v. State*, 268 S.W.3d 571, 591 (Tex. Crim. App. 2008). Many of Evans questions to Appellant were outside the realm of statement pertinent

16 | John St. Angelo v. State, Appellant's Brief

questioning on the grounds that he was testing Appellant's mental status. [RR 3:19-20.] However, Evans could have asked any of a large number of other questions to test Appellant's mental status. It is further unclear how these answers validly test Appellant's mental status unless Evans had personal knowledge of the events in order to judge Appellant's responses. At the hearing, Evans agreed that the question, "Where is your wife now?" that he asked Appellant had nothing to do with Appellant's medical care. [RR 3:44.]

### 3. Evans Was Involved Because of the Police

As noted above, Evans became involved in the case through the actions of the Fort Worth Police Department. Officer Salazar testified that she is both an EMT and a nurse in addition to her duties as a police officer. [RR 6:256.] Officer Salazar could have rendered any required medical attention to Appellant without the involvement of Evans. However, Salazar would have been required to follow art. 38.22 had she asked the same questions posed by Evans. Importantly, Salazar would have known that the Evans would be in a position to ask questions of Appellant when she volunteered to enter the ambulance. [RR 6:257-8.] Knowing that, Salazar placed herself in a position to benefit from the interrogation conducted by Evans. Furthermore, because of her dual training, Salazar would .

---

to medical diagnosis or treatment and served only to further the investigation of the Fort Worth

have been aware that Evans' questions went well beyond the bounds of those necessary for medical diagnosis or treatment. Officer Salazar should have either halted the questioning or read Appellant his *Miranda* and Art. 38.22 warnings. She failed to do either; choosing instead to carefully record Appellant's statements with paper and pen in clear violation of art. 38.22. [RR 6:259.]

### 4. Evans Helped Build The Case

Evans helped build a case that ultimately led to Appellant's conviction for the offense charged and the assessment of the maximum punishment against him. Looking at Evans' actions, it is a reasonable conclusion that the police gave Evans implicit instructions to get information from Appellant. Officer Salazar recorded Appellant's answers to Evans' questions on a notepad. [RR 6:259] Furthermore, Evans was aware that Salazar had pen and paper and was in a position to write down what Appellant was saying in response to his questions. [RR 3:21] Thus, there was implied, if not actual encouragement on the part of Officer Salazar to prompt Evans to ask questions that aided law enforcement's investigation of Appellant.

As noted above, Evans' actions and perceptions were those of an individual who was acting as an instrumentality of law enforcement. Evans was aware not

---

Police Department.

only of the presence of Officer Salazar but also that she was taking notes of Appellant's responses. This would have encouraged Evans to ask more questions and more detailed questions than are required for purposes of medical diagnosis or treatment. Officer Salazar's notes were so important to the investigation into this case that she took the time to report Evans' questions and Appellant's answers in a memorandum to homicide detective J. Cedillo. This memorandum was admitted for the record as State's Exhibit 154. [RR 6:260, 263] These facts clearly amounted to a "calculated practice" between the police and interviewer that led to incriminating responses from Appellant during the interview.

5.    The Police Set Up The Interview

The record, as a whole, shows that the police set up the interview between Evans and Appellant. The police used Evans' interview to accomplish what they could not lawfully accomplish themselves. After his arrest, Appellant was on his way to a hospital; and therefore, would not have been available to the police for a formal interrogation. The only way the police could accomplish their interrogation was to employ one of the medical professionals engaged at that time with Appellant.

There is nothing in the record from the suppression hearing regarding Appellant's perception of the encounter with Evans and Officer Salazar. In this

situation, the law considers whether a reasonable person in Appellant's position would have believed that the interviewer was a law enforcement agent. *Wilkerson*, 173 S.W.3d at 530-1. From Appellant's perspective, he would have understood that he was in the custody of law enforcement. This would have been clear to Appellant due to the fact that he had spent the afternoon surrounded by law enforcement officers, because he negotiated and communicated with law enforcement officers throughout the afternoon, because of the circumstances of his actual apprehension and arrest, because of the fact that he was escorted to the ambulance by law enforcement officers and because there was a law enforcement officer (Officer Salazar) guarding him while he was being questioned by another person in uniform (MedStar paramedic Evans).

Appellant would have believed that he was being questioned by a law enforcement officer because of the incriminating nature of the questions that a paramedic would have no medical reason to ask. Appellant would also have been in a position to be aware that Officer Salazar was recording his answers to the questions posed by Evans. After having been shot, tear-gassed, and arrested at gunpoint, Appellant was not in any position to deal with incriminating questioning. He should have been administered his *Miranda* and art. 38.22 warnings to inform him of the perils of dealing with law enforcement

interrogation. Appellant's situation is a clear illustration of why the reading of rights to a suspect is such an important factor in equipping him to deal with the perils of law enforcement interrogation. *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966).

It is clear that the primary purpose of MedStar paramedic Evans' questioning of Appellant was to gather information for law enforcement. Evans' questions were not designed to assist in the administration of medical services to Appellant. Clearly his interview was used to accomplish what law enforcement could not accomplish themselves; that is, penetrating Appellant's Fifth Amendment privilege in order to cause him to incriminate himself.

The use at trial by the State of Texas of the product of Evans' interrogation changed Evans role in this matter to that of an agent of the State. *Rodriguez-Flores v. State*, 351 S.W.3d 612, 634-5 (Tex. App.—Austin 2011, pet. ref'd)(where the State's reliance on the unwarned statements was found to implicate the Fifth Amendment). Admission of this testimony violated Appellant's Fifth Amendment rights. *Estelle v. Smith*, 451 U.S. 454, 468, 101 S.Ct. 1866, 1876, 68 L.Ed.2d 359 (1981).

Appellant was harmed at trial by the improper admission of these unwarned, custodial statements. These statements incriminated him not only in the murder of

which he was ultimately convicted; but also in the extraneous offenses of attempted capital murder of peace officers. The statements also showed a general lack of cooperation with law enforcement during the alleged incident. The admission of the statements served to bolster the credibility of the State's witnesses to Appellant's detriment. Furthermore, Appellant testified at the guilt/innocence phase of the trial contrary to the content of these improperly admitted statements. [RR 7:275-80, 288, 291-5, 300, 343.] The improper admission of the statements put him in a position of reduced credibility in the eyes of the jury. The fact that Appellant received the maximum sentence from the jury indicates that the jury considered his unwarned, custodial statements against him. The ultimate outcome of the trial indicates that the jury doubted Appellant's credibility.

Consequently, this court should hold that the trial court's admission of Appellant's unwarned, custodial statements was an abuse of discretion. Further, this court should hold that the admission of this evidence was harmful and reverse the trial court's judgment.

## POINT OF ERROR TWO

### I.    Point of Error

The trial court abused its discretion by unreasonably restricting defense counsel's voir dire.

### II.    Background Facts

At the conclusion of defense counsel's voir dire, she requested more time from the court to question the prospective jurors.  [RR 4:167-8.]  This request immediately followed a bench conference that was off the record in which the trial court presumably informed counsel that she had used her allotted time.  [RR 4:166.]

Defense counsel proceeded to outline to the court several critical areas of law that she needed to cover with the venire.  These additional topics included the use of deadly force in the self-defense context, Appellant's Fifth Amendment privilege to not testify, the burden of proof pertaining to the sudden passion issue and the burdens of proof pertaining to criminal cases in general.  [RR 4:168.]

### III.    Standard of Review

The control of the voir dire examination is within the sound discretion of the trial judge. It is well settled that the trial judge's discretionary authority extends to

imposing reasonable limitations on the time available to counsel to question the jury panel. *Caldwell v. State*, 818 S.W.2d 790, 793 (Tex. Crim. App. 1991).

Accordingly, a trial court's decision to limit defense counsel's questioning during voir dire will be reviewed to determine whether such a restraint amounts to an abuse of discretion. *Lagrone v. State*, 942 S.W.2d 602, 609 (Tex. Crim. App. 1997); *Smith v. State*, 703 S.W.2d 641, 643 (Tex. Crim. App. 1985).

IV.    Applicable Law

The right to be represented by counsel, guaranteed by Article 1, Section 10 of the Texas Constitution, encompasses the right of counsel to question the members of the jury panel in order to intelligently exercise peremptory challenges. *Jones v. State*, 223 S.W.3d 379, 383 (Tex. Crim. App. 2007); *De La Rosa v. State*, 414 S.W.2d 668, 671 (Tex. Crim. App. 1967).

The right of counsel to question venire members and the right of the trial court to control the voir dire and impose reasonable restrictions coexist and must be harmonized. *Ratliff v. State*, 690 S.W.2d 597, 599 (Tex. Crim. App. 1985). Each case must be examined on its own facts. A reasonable time limitation for one case may not be reasonable for another. *Ratliff*, 690 S.W.2d at 600. The amount of time allotted is not, by itself, conclusive. If a trial court must impose time limitations prior to voir dire, error occurs where those time limitations become

inflexible. Various and unpredictable considerations such as the complexity of the case or the makeup of the venire may prolong voir dire examination. *Morris v. State*, 1 S.W.3d 336, 336 (Tex. App.—Austin 1999, no pet.).

A trial court must grant additional time where a legitimate request, based on a showing of a need to proffer material and necessary questions has been made; such as was done in this case. *Clemments v. State*, 940 S.W.2d 207, 209 (Tex. App.—San Antonio 1997, pet. ref'd).

Where the defendant is restricted while questioning a venire, two factors are relevant in determining whether a trial court abused its discretion in limiting voir dire time: (1) whether the defendant's voir dire examination reveals an attempt to prolong the voir dire; for example, whether the questions were irrelevant, immaterial or unnecessarily repetitious; and (2) whether the questions that the defendant was not permitted to ask members of the venire were proper voir dire questions. *Morris*, 1 S.W.3d at 339-40; *McCarter v. State*, 837 S.W.2d 117, 120 (Tex. Crim. App. 1992)(two-prong test applied in cases where counsel was asking general questions of the venire). Defense counsel does not unnecessarily prolong voir dire merely by addressing matters previously covered by the trial court or the state. *Tobar v. State*, 850 S.W.2d 182, 182-3 (Tex. Crim. App. 1993).

V.    Application of Law to Facts

Counsel for Appellant preserved error by reciting into the record the questions that she requested to ask of the venire. *Clemments*, 940 S.W.2d at 209-10.

Each of the questions defense counsel posed during her voir dire were proper questions because their purpose was to discover venire members' views on issues applicable to the case. *Whitemon v. State*, 460 S.W.3d 170, 176 (Tex. App.—Fort Worth 2015, pet. ref'd). For example, defense counsel sought to question the venire regarding their views on the issue of self-defense. Questions regarding self-defense are appropriate voir dire questions. *See London v. State*, 325 S.W.3d 197, 202 (Tex. App.—Dallas 2008, pet. ref'd); *Harris v. State*, 784 S.W.2d 5, 23 (Tex. Crim. App. 1989).

Additionally, questions regarding a juror's ability to follow the law if the defendant does not testify are relevant questions during voir dire. *Morris*, 1 S.W.3d at 342; *Guerra v. State*, 771 S.W.2d 453, 467 (Tex. Crim. App. 1988).

As well as questions relating to the burdens of proof. *Staley v. State*, 887 S.W.2d 885, 892 (Tex. Crim. App. 1994).

In this case, defense counsel made expeditious use of her limited voir dire time. She did not seek to prolong the voir dire by asking needless or immaterial questions, or by repeating herself. The record does not reflect how long her voir dire lasted but it does reflect that her voir dire covered sixty-four pages. [RR 4:105-69.] By comparison, the State's voir dire covered eighty-six pages. [RR 4:19-105.] The State never objected that her voir dire was dilatory or repetitious. *Clemments*, 940 S.W.2d at 209 (lack of objection cited by the court as an indication that opposing counsel's voir dire was expeditious).

This was a very complex case with multiple legal and emotional issues that required exploring with the venire on voir dire. There were significant issues at both phases of the trial that had to be explained to the venire in detail before counsel could determine the juror's ability to follow the law and their attitudes on these complex issues.

Examining the two factors set out in *Morris*, above, it is clear that counsel did not attempt to prolong the voir dire and that she wished to cover permissible (in fact, critical) subject matter. It would have been but a small imposition on the time of the trial court to allow defense counsel to question the venire on these important

topics. These questions were essential to the intelligent exercise of Appellant's peremptory challenges. *Jones*, 223 S.W.3d at 383. By failing to so allow, the trial court abused its discretion thereby costing Appellant a fair trial.

Since Appellant's counsel did not improperly attempt to prolong voir dire, and because the questions she was prevented from asking were material and relevant to the issues in the trial, this court should conclude that the trial court abused its discretion in limiting Appellant's voir dire. *Clemments*, 940 S.W.2d at 211; *McCarter*, 837 S.W.2d at 122.

Appellant was harmed in that he was forced to seat jurors who may not have understood the concepts of law that defense counsel requested to inquire about; and worse yet, may have actually had to seat jurors who were unable to fairly consider the law upon which he was entitled to rely. *McCarter*, 837 S.W.2d at 121. Those that were unable to fairly consider the law that Appellant was entitled to rely on would have been the subject of challenges for cause during voir dire and would have been eliminated from service on the jury had Appellant been allowed to address the issues. *McCarter*, 837 S.W.2d at 121.

Consequently, this court should hold that the trial court's failure to allow defense counsel to question the venire on these topics was an abuse of discretion.

Further, this court should hold that the admission of this evidence was harmful and reverse the trial court's judgment.

## POINT OF ERROR THREE

I.   Point of Error

The trial court abused its discretion by admitting an email that was not sufficiently authenticated.

II.   Background Facts

The trial court erred in admitting State's Exhibit 40 because it was improperly authenticated and contained inadmissible hearsay. Through State's witness Dee Arnold during the guilt/innocence phase of the trial, the State of Texas offered what purported to be an email exchange between Appellant and Ms. Suzanne Parsons, the complainant in the case.

The trial court admitted this email, identified at trial as State's Exhibit 40, over hearsay and authentication objections from defense counsel. [RR 5:59-60.] [See Appendix.]

III.   Standard of Review

When reviewing a trial court's decision to admit evidence, appellate courts use an abuse of discretion standard. An appellate court will reverse a trial court's ruling on the admissibility of evidence where the ruling falls outside the zone of

reasonable disagreement. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). The trial court's ruling in the instant case falls outside of the zone of reasonable disagreement because there is simply no evidence that State's Exhibit 40 is authentic.

### IV. Applicable Law

The problem of authentication arises when the relevancy of evidence depends upon its identity, source, or connection with a particular person, place, thing, or event. *Kephart v. State*, 875 S.W.2d 319, 321 (Tex. Crim. App. 1994). Rule 901 of the *Texas Rules of Evidence* sets out the rule for the authentication of evidence in a criminal case. Under Rule 901(a) authentication is a condition precedent to admissibility of evidence. The proponent of the evidence is required to make a threshold showing that would be sufficient to support a finding that the matter in question is what the proponent claims. *Tienda*, 358 S.W.3d at 638; *Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007).

Subsection (b) of Rule 901 contains ten subsections illustrating what may be deemed sufficient authentication in the case of a particular item of evidence. *See Wood v. State*, 18 S.W.3d 642, 647 (Tex. Crim. App. 2000). Only subsection 1 (testimony of a witness with knowledge) and subsection 4 (distinctive characteristics) of Rule 901(b) are even arguably relevant to a discussion

regarding the authenticity of an email. Upon examination of the testimony leading up to the trial court's erroneous admission of State's Exhibit 40, it is clear that there was a lack of testimony put forth by the sponsoring witness to support admissibility of the exhibit under either relevant theory contained in Rule 901.

## V. Application of Law to Facts

When examining the admissibility of State's Exhibit 40 under the auspices of Rule 901(b)(1) (testimony of a witness with knowledge), there is no doubt that the predicate put forth by the State for admission falls short of the threshold required under the Rule. The sponsoring witness was "not sure" of the email address of the complainant, from whom she had purportedly received the exhibit. [RR 5:58.] Then after the prosecutor refreshed the memory of the sponsoring witness, she identified the email address. The sponsoring witness then indicated that the exhibit was an email that was forwarded to her that day, which she then testified was December 30th. [RR 5:58.] The sponsoring witness then testified that the exhibit fairly and accurately depicted what she received that day. However, the sponsoring witness did not testify how she recognized the exhibit as the same as she received that day. [RR 5:57-9.]

Furthermore, the State admitted State's Exhibit 40 because it purports to contain material authored by Appellant. The only testimony offered to

authenticate this portion of the exhibit is the recitation from the sponsoring witness that the complainant indicated to her that the email came from John; a statement that is hearsay. [RR 5:59.] There is no indication in the testimony of the sponsoring witness that she had any knowledge of the contents of the email except that she received it that day from the complainant. [RR 5:57-9.] Defense counsel objected to the admissibility of the exhibit on hearsay grounds indicating that the only testimony that supported its admissibility was hearsay. [RR 5:59-60.] The sponsoring witness at no time indicated that she knew or recognized the contents of Appellant's purported section(s) of the exhibit. [RR 5:57-9.] The sponsoring witness never testified that she recognized the originating email address within the exhibit to be that of Appellant and never testified that she recognized any portion of the contents of the exhibit as having originated from Appellant. [RR 5:57-9.]

State's Exhibit 40 also cannot be authenticated on the basis that it contains distinctive characteristics that allowed the sponsoring witness to recognize it as authentic under Rule 901(b)(4). In a proper case, email evidence can be authenticated by utilizing characteristic evidence such as: (1) consistency with the e-mail address on another e-mail sent by the defendant; (2) the author's awareness through the email of the details of defendant's conduct; (3) the e-mail's inclusion

of similar requests that the defendant had made by phone during the time period; and (4) the e-mail's reference to the author by the defendant's nickname. *Massimo v. State*, 144 S.W.3d 210, 215-6 (Tex. App.—Fort Worth 2004, *no pet.*), *citing United States v. Siddiqui*, 235 F.3d 1318, 1322-23 (11th Cir. 2000). None of these distinctive characteristics is present in the instant case. [RR 5:57-9.] As mentioned above, the sponsoring witness did not testify that she recognized any email address in the exhibit as belonging to Appellant. The sponsoring witness did not testify that she was personally aware of any purported conduct of Appellant related in the exhibit. [RR 5:57-9.] This exhibit did not contain information purportedly related by Appellant that he also purportedly related to the sponsoring witness by telephone. Finally, there is nothing in the email that conclusively identifies the author as Appellant. [RR 5:57-9.] Thus, the email in question was not authenticated by its "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." *See Wood*, 18 S.W.3d at 647. All the State could muster was a blanket statement from the sponsoring witness that she recognized the exhibit as having been sent to her. She had no familiarity with the contents of State's Exhibit 40.

As a parallel, evidence pertaining to a social networking website is also inadmissible unless the proponent makes a showing by circumstantial evidence that the evidence is what the proponent claims it to be. This threshold will be reached where the individual, particular details of the proffered evidence combine into sufficient indicia of authenticity to support a prima facie case that would justify admitting the evidence and submitting the ultimate question of authenticity to the jury. *Tienda*, 358 S.W.3d at 645 (where numerous unique photographs of the defendant on the site, numerous references within the text on the site and biographical data from the subscriber information all combined to authenticate the evidence). Here there are no individual, particular details that combine to authenticate the exhibit and the sponsoring witness failed to testify to any.

When considering the admissibility of evidence under Rule 901, the trial court should admit evidence only if it finds that a reasonable juror could, as opposed to would, find the evidence to have been authenticated. *Coleman v. State*, 833 S.W.2d 286 (Tex. App.—Houston [14th Dist.] 1992, *no pet.*). No reasonable juror would have found State's Exhibit 40 to be properly authenticated as an email that was authored by Appellant.

Any argument by the State which asserts that that State's Exhibit 40 is admissible because it was recognized by the sponsoring witness or because it is admissible under the reply-letter doctrine, fails.

The exhibit at issue is not admissible under the sponsor-recognition theory because there is no testimony that the sponsoring witness recognized the email address of Appellant from the exhibit. [RR 5:57-60.] Under this theory, State's Exhibit 40 was not properly authenticated and should have been excluded from the jury's consideration. *Shea v. State*, 167 S.W.3d 98, 105 (Tex. App.—Waco 2005, *pet. ref'd*).

State's Exhibit 40 also cannot be authenticated by relying on the reply-letter doctrine. The reply-letter doctrine requires that the letter (or email) in question have been received by the sponsoring witness in the due course of mail purportedly in answer to another letter (or email). *Varkonyi v. State*, 276 S.W.3d 27, 35 (Tex. App.—El Paso 2008, *pet. ref'd*). There is no testimony here that State's Exhibit 40 was received by the sponsoring witness in response to an email from Appellant. As was mentioned above, the sponsoring witness demonstrated no knowledge of the contents of what purported to be Appellant's portion of the exhibit or his purported email address.

Appellant has been harmed by the admission of State's Exhibit 40. Appellant testified at trial that he acted in self-defense in response to provocation by the complainant. State's Exhibit 40 contains language that the State claimed was authored by Appellant that contradicts his testimony. The exhibit contains threats, insults, and wishes that the complainant would "expire." This evidence contradicts Appellant's self-defense claim and negatively impacted his credibility in front of the jury.

Consequently, this court should hold that the trial court's admission of State's Exhibit 40 was an abuse of discretion. Further, this court should hold that the admission of this evidence was harmful and reverse the trial court's judgment.

## PRAYER

For the reasons set forth herein, Appellant prays this case be reversed and remanded for a new hearing, and for such other relief as he may show himself deserving at law or in equity.

Respectfully submitted,

ROBERT K. GILL

By: _____
Robert K. Gill
Attorney for Appellant
201 Main Street, Ste. 801
Fort Worth, Texas 76102
(817) 803-6918
FAX (817) 338-0700
State of Texas Bar Card
Number 07921600
*BOB@GILLBRISSETTE.COM*

## CERTIFICATE OF SERVICE

I, Robert K. Gill, attorney for the Appellant, do hereby certify that a true and correct copy of the above and foregoing Brief of the Appellant has been e-served to Hon. Debra Windsor, Tarrant County Assistant District Attorney, at COAAppellateAlerts@TarrantCounty.com, on this the 19th day of November 2015, and an efiled-stamped copy will be deposited in first class U.S. mail addressed to:

Mr. John St. Angelo
Appellant
TDCJ 1990345
7G-62B
Clements Unit
9601 Spur 591
Amarillo, TX 79107

on this the __19th__ day of November, 2015.

Robert K. Gill

# CERTIFICATE OF COMPLIANCE

I hereby certify that in compliance with Tex. R. App. P. 9.4(i)(2)(B), the

foregoing document contains 7,770 words, including any parts exempted by Tex.

R. App. P. 9.4(i)(2)(B). Signed on this the 19th day of November, 2015.

_____
Robert K. Gill

# APPENDIX



☒ Me

Dee Arnold

RE/MAX Heritage I, II, & III

Director of Agent Services & Solutions

Director of Production & Finance

Director of Relocation

Keller, Colleyville, Southlake

817-745-3100

"Nothing's gonna change MY world, because all you need is LOVE"

"The world is what WE make of it"

From: Suzanne Parsons [mailto:sparsons_realtor@yahoo.com]
Sent: Monday, December 30, 2013 12:12 PM
To: Dee Arnold
Subject: Fw: FW: Return call / please

*Suzanne J. Parsons, Realtor®*

RE/MAX-Heritage®
4200 Heritage Trace Parkway, Suite 100
Fort Worth, Texas 76244
Office 817-745-3100
Cell 682-472-6595



STATE'S
EXHIBIT
**40**

ST. ANGELO

Lisa Morton, CSR
3/26/15

Fax 817-533-2839
sparsons_realtor@yahoo.com
sparsons@rmheritage.net
www.suzanneparsons.remax-texas.com

----- Forwarded Message -----
**From:** Suzanne Parsons <sparsons_realtor@yahoo.com>
**To:** John St Angelol <beyndsaint@aol.com>
**Sent:** Sunday, December 29, 2013 11:34 AM
**Subject:** Re: FW: Return call / please

These are clearly threats and will be reported.

Sent from Yahoo Mail on Android

**From:** John St Angelol <beyndsaint@aol.com>;
**To:** Suzanne Parsons st. angelo <sparsons_realtor@yahoo.com>;
**Subject:** FW: Return call / please
**Sent:** Sun, Dec 29, 2013 1:09:36 PM

**From:** John St Angelol
**Sent:** 12/29/2013 6:38 AM
**To:** John St Angelol
**Subject:** RE: Return call / please

So you and your new fuck took off for the weekend,you truly are a whore,a fat ass whore,that's all you were waiting for the papers...i should of done it while I had you in my grips, you have been lying for month's, remember what I told you , the list is long, your brother was right...thats why you quit fucking me slowly and slowly, then the bomb...i would seriously relocate to avoid any more conflicts, I am getting all my stuff today, all of it, even the stuff I loaned Jessica, couches,chairs, tables,washer dryer, wow you really taught your kids how to be just assleezy white trash as you are, fuck me, you are just a gold digging fat,fat ass whore, I fucking knew it, now its going to be known to everyone, your dark dirty little secret, oh its not slander, and your other half, wait to see that outcome,its to bad you did this to yourself, I never would of thought you were this apartment grade, low low class whore, all the porn videos of your past, lesbianism encounter's,countless toys and other atrocious things u have used for sex, bubble fun ad you called it...remember freedom of speech, its everyone right, I also want off the lease, I want mu deposit back, I'm calling trek on you, the IRS on you, I wish you would expire and karma will be your payback....im not going to say anything to your company and I suggest you don't either, you have not succeeded to the end....
WOW, WOW, WOW, YOU ARE THE EPITOME OF AN EXCUSE EVEN TO CONSIDER YOURSELF A GOOD PERSON,AND I WILL ALWAYS BE THAT THORN IN YOUR GARDEN AS YOU CALL IT FOREVER...YOU ASKED ME BACK HERE JUST TO BE CLOSER FOR DIVORCE TO SIGN PAPERS, SO YOU SET THIS UP, GRADUALLY BACK STEPPING, I WAS AND HAVE BEEN RIGHT, IM TAKING YOU TO COURT,

I will sue you for everything
You are going to pay or I will collect it myself...no problem, like you dsu.

**From:** John St Angelol
**Sent:** 12/29/2013 12:44 AM
**To:** Suzanne Parsons
**Subject:** RE: Return call / please

You can't call me, now you block the work phone,you having a party, why can't you talk to me,.because I wad right. You can't tell me what the firemen said, you think this is fun and games, I need to talk to you, seriously, y won't you talk to me, you lied about everything,I'm just making it up your fucking someone and you know it, I'll be within my rightsyour pushing the wrong way to resolve this.

**From:** Suzanne Parsons
**Sent:** 12/28/2013 6:02 PM
**To:** John St Angelol
**Subject:** Re: Return call / please

This is your call back I can not talk. If it is work talk to Jessica or it will have to wait until Monday. No one is taking work from you once again.

Sent from Yahoo Mail on Android

**From:** John St Angelol <beyndsaint@aol.com>;
**To:** Suzanne Parsons st. angelo <sparsons_realtor@yahoo.com>;
**Subject:** Return call / please
**Sent:** Sat, Dec 28, 2013 11:51:23 PM

You said to email, I do and get no response, I call, no response,I text no response, I get work taken away from being to thorough, and slow, a d sometimes let my personal problems get in between in the past..
My time is valuable as is yours, so with due respect, I will except a call back.   Thanks